Natalie Lyons, No. 293026
Vess A. Miller, No. 278020
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
Tel: (317) 636-6481
nlyons@cohenmalad.com
vmiller@cohenmalad.com

*To move for *pro hac vice* admission
[*additional counsel listed on signature pages*]

**Counsel for Plaintiffs and the Proposed Class**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ETHAN ALLISON, and MARK CALOCA,** individually and on behalf of all others similarly situated,<br><br>**Plaintiffs**<br><br>v.<br><br>**UNITED WHOLESALE MORTGAGE,**<br><br>**Defendant.** | Civil Action No. ——————————3:25-v-05377-WHO<br><br>**AMENDED** CLASS ACTION COMPLAINT FOR:<br>1. Negligence<br>2. ~~Negligence Per Se~~<br>~~3.~~2. Violation of Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502<br>~~4.~~3. Violation of Consumer Protection Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*<br>~~5.~~4. Violation of Consumer Privacy Act, Cal. Civ. Code, §§ 1798.100, *et seq.*<br>~~6.~~5. Breach of Express and Implied Contract<br>~~7.~~6. Unjust Enrichment<br>~~8.~~7. Declaratory Judgment<br>~~9.~~8. Breach of Confidence<br>~~10.~~9. Violation of Invasion of Privacy Act, Cal. Pen. Code §§ ~~630~~631, *et seq.*<br>10. Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 632, *et seq.*<br>11. Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 638.51, *et seq.*<br>~~11.~~12. Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(1), *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Ethan Allison and Mark Caloca, individually, and on behalf of all others similarly situated (hereinafter "Plaintiffs") bring this Amended Class Action Complaint against Defendant, United Wholesale Mortgage ("UWM" or "Defendant"), and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows.

## INTRODUCTION

1.  Plaintiffs bring this class action to address Defendant's outrageous, illegal, and widespread practice of disclosing—without consent—the Nonpublic Personal Information[1] and Personally Identifiable Financial Information[2] (together, "Personal and Financial Information") of Plaintiffs and the proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"), Google, LLC ("Google"), Microsoft Corp. ("Microsoft"), LinkedIn, CrazyEgg, lordofthesuperfrogs.com, and Dynatrace, and possibly others (collectively the "Third Parties") (in short, "the Disclosure").

2.  UWM is a massive mortgage lender and servicer that provides services to customers across the globe and the United States, including in California. To provide these services, UWM operates and encourages its customers to use its website, https://www.uwm.com/

---

[1] The United States Congress defines "nonpublic personal information" as "personally identifiable financial information-- (i) provided by a consumer to a financial institution; (ii) resulting from any transaction with the consumer or any service performed for the consumer; or (iii) otherwise obtained by the financial institution." The Gramm-Leach-Bliley Act, 15 U.S.C.A. § 6809(4)(A) ("GLBA").

[2] "Personally identifiable financial information means any information: (i) A consumer provides to [a financial institution] to obtain a financial product or service from [the financial institution]; (ii) About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or (iii) [a financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer." 16 C.F.R. § 313.3(o)(1).

(the "Website"), on which customers can, among other things, learn about UWM, access their account information, manage their mortgage, and obtain information about UWM's services.

3.      Despite its unique position as a massive and trusted mortgage lender and servicer, UWM used its Website to blatantly collect and disclose Consumers'[3] and Customers'[4] (collectively, "Customers") Personal and Financial Information to Third Parties uninvolved in the provision of mortgage services—entirely without their knowledge or authorization. UWM did so by knowingly and secretly configuring and implementing code-based tracking devices ("trackers" or "tracking technologies") into its Website.

4.      Through these trackers, UWM disclosed and continues to disclose Personal and Financial Information that Customers input into and accessed on UWM's Website. This information includes without limitation, the user's status as a customer; when the customer logged in to UWM's website; the user's browsing activities and website behaviors, including that the user clicked certain buttons and what URLs or webpages they led to; the pages users visited; that a user was on a mortgage account login page; that a user is viewing their loans after logging in; and the different types of statements that a user viewed.

5.      Upon information and belief, UWM utilized data from trackers to improve and to save costs on its marketing campaigns, improve its data analytics, attract new customers, and generate sales. UWM benefited from use of Customers' Personal and Financial Information. UWM

---

[3] The term "consumer" means "an individual who obtains or has obtained a financial product or service . . . that is to be used primarily for personal, family, or household purposes, or that individual's legal representative." 16 C.F.R. § 313.3; 15 U.S.C.A. § 6809(9).

[4] "Customer means a consumer who has a customer relationship with [a financial institution]." 16 C.F.R. § 313.3. "The term 'time of establishing a customer relationship' shall . . . in the case of a financial institution engaged in extending credit directly to consumers to finance purchases of goods or services, mean the time of establishing the credit relationship with the consumer." 15 U.S.C.A. § 6809.

AMENDED CLASS ACTION COMPLAINT

further allowed the Third Parties, who are uninvolved in UWM's provision of mortgage services, to profit from its Disclosure of Customers' Private and Financial information. And the Third Parties used Customers' Personal and Financial Information for themselves and disclosed to fourth parties who also profited off of it. Facebook, for example, will use the data collected from Customers of UWM to sell ads to fourth parties who will further profit off the use of that information

6.      Customers, like Plaintiffs and Class Members, simply do not anticipate that a trusted mortgage lender and servicer will send their Personal and Financial Information to hidden Third Parties (who in turn share with fourth parties), all of whom profit off of it. Likewise, when Plaintiffs and Class Members used Defendant's Website, they thought they were communicating exclusively with a trusted mortgage lender and servicer for the sole purpose of obtaining mortgage information and/or services.

7.      At no time did UWM disclose to Plaintiffs or Class Members that it was sharing their Personal and Financial Information with the Third Parties for third- and fourth-party use. Plaintiffs and Class Members never signed a written authorization permitting Defendant to send their Personal and Financial Information to the Third Parties who were uninvolved in the provision of financial services.

8.      Defendant owed a variety of duties, including common law, statutory, contractual, and regulatory duties, to keep Plaintiffs' and Class Members' Personal and Financial Information safe, secure, and confidential.

9.      Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Personal and Financial Information, Defendant assumed legal and equitable duties to those individuals to protect and safeguard their information from unauthorized disclosure.

10.      The statutory and regulatory duties UWM owed Customers include its obligations

under federal law. For example, the GLBA requires that "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801. Under this federal law, financial institutions like UWM are explicitly prohibited from disclosing a Customer's Personal and Financial Information without sufficient advance notification and opt-out opportunity. 15 U.S.C. § 6801, *et seq.*

11.    UWM ignored all its duties and obligations, including the GLBA's requirements, by disclosing Customers' Personal and Financial Information without proper advance notification and opt-out rights as required under the GLBA.

12.    Examples of "Personal and Financial Information" included in the GLBA are indistinguishable from the types of information UWM disclosed to Third Parties like Facebook, Google, and Microsoft, including, among other things: (a) "[i]nformation a consumer provides to [UWM] on an application to obtain a loan, credit card, or other financial product or service"; (b) "[t]he fact that an individual is or has been one of [UWM's] customers or has obtained a financial product or service from [UWM]"; (c) "information about [UWM] consumer . . . disclosed in a manner that indicates that the individual is or has been [UWM] consumer"; and (d) "any information [UWM] collect[s] through an Internet 'cookie' (an information collecting device from a web server)." 16 C.F.R. 313.3(o)(2)(i).

13.    UWM breached its duties under California state law, including, for example, the California Consumer Privacy Act. That statue provides California consumers with rights to control their personal information including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, and the right to request deletion of their personal information.

Cal. Civ. Code § 1798.100, *et seq*. UWM breached its obligations under this statute by, for example, failing to provide Customers with appropriate notice that their information was being disclosed to Third Parties for third- and fourth- party use. The notice and consent UWM purports to provide and obtain, through the policies it provides on its website, is not appropriate or sufficient, as a reasonable Consumer would not have understood those policies as notifying them of UWM's disclosure of their Personal and Financial Information to Third Parties for third- and fourth- party use.

14.    UWM breached its common law, statutory, and contractual obligations to Plaintiffs and Class Members by, *inter alia*, (i) failing to adequately review its marketing programs and web based technology to ensure its Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to collect and share Personal and Financial Information; (iii) aiding, agreeing, and conspiring with the Third Parties to intercept communications sent and received by Plaintiffs and Class Members; (iv) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Personal and Financial Information to Third Parties for Third Party and fourth party use; (v) failing to protect Personal and Financial Information and take steps to block the transmission of Plaintiffs' and Class Members' Personal and Financial Information through the use of tracking technology; (vi) failing to warn Plaintiffs and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of its customers' Personal and Financial Information.

15.    Plaintiffs seek to remedy these harms and brings causes of action of (I) Negligence; (II) Negligence Per Se; (III) Violation of the Comprehensive Computer Data Access And Fraud Act ("CDAFA"), Cal. Penal Code § 502; (IVIII) Violation Of California's Consumer Protection Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (VIV) Violation of California Consumer

Privacy Act ("CCPA"), 1798.100, *et seq*.; (~~VI~~V) Breach of Express and Implied Contract; (~~VII~~VI) Unjust Enrichment; (~~VIII~~VII) Declaratory Judgment; (~~IX~~VIII) Breach Of Confidence; (~~X~~IX) Violation of The California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ ~~630~~631, *et seq*.; (X) Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 632, *et seq*.; (XI) Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 638.51, *et seq*.; (XII) Violation of The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(1), *et seq*.; and (~~XII~~XIII) Violation of The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(3)(a) Unauthorized Divulgence By Electronic Communications Service.

16.    Plaintiffs bring this action, individually and on behalf of all others similarly situated, for damages and equitable relief.

## PARTIES

17.    Plaintiff Ethan Allison is a natural person and citizen of California, where he intends to remain. Plaintiff Allison resides in Foster City, San Mateo County, California. Plaintiff Allison had a mortgage with UWM and is a victim of Defendant's unauthorized Disclosure of Personal and Financial Information.

18.    Plaintiff Mark Caloca is a natural person and citizen of California, where he intends to remain. Plaintiff Caloca resides in Fremont, Alameda County, California. Plaintiff Caloca has multiple mortgages with UWM and is a victim of Defendant's unauthorized Disclosure of Personal and Financial Information.

19.    Defendant UWM is a Delaware corporation formed in Michigan that services mortgage loans. Defendant transacts or has transacted business in this District and throughout the United States, including California.

20.    UWM is a financial institution, as that term is defined by Section 509(3)(A) of the

GLBA, 15 U.S.C. § 6809(3)(A).

## JURISDICTION AND VENUE

21.     This Court has personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in this State, maintains corporate offices in California, and committed tortious acts in this State.

22.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Complete diversity exists between Defendant and at least one member of the proposed Classes, and there are more than one hundred (100) members in the proposed Classes.

23.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because it arises under the laws of the United States. The Court has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. § 1367.

24.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district and continue to occur in this district.

## COMMON FACTUAL ALLEGATIONS

**A. UWM: A Dominant Mortgage Lender and Servicer that Collects Personal and Financial Information Under the Guise of Protecting it**

25.     UWM advertises itself as "[t]he #1 [m]ortgage [l]ender [i]n [t]he [n]ation".[5]

26.     Frequently, home buyers and homeowners are introduced to UWM after their mortgage is sold or assigned to the company for servicing.

27.     On information and belief, UWM provides mortgage services to Customers in

---

[5] *Home | UWM.com*, https://www.uwm.com/ (last visited June 6, 2025).

every state in America.

28.    UWM represents to its customers that it "understands the need to safeguard your information from unauthorized use and disclosure."[6]

29.    Through its Website, UWM allows users to explore various services relating to their mortgages and home loans such as conventional, FHA, Jumbo, VA, USDA, and HELOC loans,[7] as well as learn about UWM,[8] join UWM,[9] make payments,[10] and access their existing UWM account.[11] In short, Defendant encourages customers to use its Website to apply for, manage, and access their mortgages and accounts.

30.    Defendant encourages the use of its Website in service of its own goal of increasing profitability. In furtherance of that goal, Defendant purposely and secretly installed the Third Parties' online tracking technology onto its Website to gather and share information about Customers.

31.    UWM utilized the information it collected to market its services and bolster its profits by surreptitiously diverting the information to Third Parties like Google and Facebook.

32.    But Defendant did not only collect information for its own use; Defendant also shared—and continues to share—Customers' information, including Personal and Financial Information, with the unauthorized Third Parties who then use it for their own benefit and to benefit fourth parties who are even further removed from the Customers.

---

[6] *Terms of Use |UWM.com*, https://www.uwm.com/terms-of-use (last visited June 17, 2025) (attached as Exhibit A).

[7] *Loan Products | UWM.com*, https://www.uwm.com/loan-products (last visited June 17, 2025).

[8] *Why UWM | UWM.com*, https://www.uwm.com/why-uwm (last visited June 17, 2025).

[9] *Join | UWM.com*, https://www.uwm.com/join-now (last visited June 17, 2025).

[10] *Make A Payment Or View Your Mortgage | UWM.com*, https://uwm.com/loan-servicing (last visited June 17, 2025).

[11] *Sign In*, UWM.COM, https://www.uwm.com/login (last visited June 17, 2025).

**B. Third Parties and Trackers: Collectors and Profiteers of Personal and Financial Information**

33.    The invisible Third Party online tracking technologies installed by UWM on its Website gathers a vast assortment of Customer data. The installation of these trackers—and thus their transmission of data—is in UWM's exclusive control.

34.    When an individual accesses a webpage containing online tracking technology from a Third Party, the trackers instantaneously and surreptitiously duplicate communications with that webpage and send them to the Third Party. The information travels directly from both the user's browser and the webpage owner's server and then on to the Third Party's server, based off instructions from the Third Party's tracker. The communications and information transmitted via these trackers are entirely in Defendant's control. Customers trust UWM with the information they input on UWM's Website, and UWM is in complete and exclusive control of its Website and the data input therein.

35.    Online tracking technologies may not be deleted from an individual's device; they are built into a webpage, and a ~~webpage~~ Customer has no control or warning over their presence on the webpage or that they collect certain data ~~collection~~. Third party trackers cause information to flow directly from the website Customer's browser and the website owner's server to the Third Party itself. A webpage Customer cannot prevent or even detect this transmission of data.

36.    Accordingly, without any knowledge, authorization, or action by a user, a website owner who has installed Third Party trackers is utilizing website source code to commandeer its users' computing devices and web browsers, causing them to invisibly re-direct the users' communications to Third Parties.

37.    In this case, Defendant employed the Third Party trackers to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Personal and Financial Information to the Third

Parties contemporaneously, invisibly, and without the customer's knowledge.

38.    Consequently, when Plaintiffs and Class Members visited Defendant's Websites and communicated their Personal and Financial Information, that information was simultaneously intercepted and transmitted to the Third Parties.

39.    The Third Party trackers do not provide any substantive content on UWM's Website. Their only purpose is to collect and share information to be used for the Third Party and fourth parties' marketing and sales purposes.

40.    The Facebook or Meta Pixel, for example, "tracks the people and type of actions they take" on a website.[12] It can be used to gather customer data, identify customers and potential customers, target advertisements to those individuals, and market products and services. This includes when a user visits a particular webpage, clicks a button, fills out a form (including the information from the form like the state in which the property is located, the reason the customer is seeking to refinance, etcetera), IP addresses, web browser information, page location, any custom events set by the website owner, the tracker ID, and more.[13] Facebook does all of this by using the Meta Pixel to send "events" to its server.

41.    Once the data is collected via the Meta Pixel, Facebook aggregates it to build its own massive, proprietary dataset, which Facebook then uses to find new customers, drive sales, and understand ad impact. This is all to the benefit of the website owner, like UWM, Facebook as the third party, and other fourth parties, all of whom use the information for targeted marketing

---

[12] *Retargeting*, Meta, https://www.facebook.com/business/goals/retargeting (last visited Aug. 11, 2024).
[13] *See, e.g.*, *Meta Pixel*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/ (last visited Aug. 11, 2024); *Specifications for Facebook Pixel Standard Events,* Meta, https://www.facebook.com/business/help/402791146561655 (last visited Aug. 11, 2024); *see also Facebook Pixel, Accurate Event Tracking, Advanced*, Meta for Developers https://developers.facebook.com/docs/facebook-pixel/advanced/ (last visited Aug. 11, 2024).

campaigns. Targeting works by allowing fourth parties to direct their ads at particular "Audiences,"

subsets of individuals who, according to Facebook, are the "people most likely to respond to your

ad."[14]

42.     Upon information and belief, the Meta Pixel installed on UWM's website collects

data including the "c_user cookie," which enables Facebook to link the user to their logged in

Facebook account and thereby identify the user.

43.     Data harvesting is big business for Facebook; it drives Facebook's advertising sales,

which are its profit center. In 2023, Facebook generated nearly $135 billion in revenue, roughly

98% of which was derived in advertising revenue alone space.[15] This business model is not limited

to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer

data is so valuable that it has been described as the "new oil."[16] Conservative estimates suggest

that in 2018, Internet companies earned $202 per American user from mining and selling data.

That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a

total of more than $200 billion industry wide. The updated 2025 numbers show "the annual value

of your data if you live in the US is at least $700" per user.

44.     On information and belief, the trackers Defendant installed from other Third

Parties, including Google, Microsoft, LinkedIn, CrazyEgg, lordofthesuperfrogs.com, and

Dynatrace work similarly to the Meta Pixel and likewise transmitted Plaintiffs' and the Class

Members' Personal and Financial Information without Plaintiffs' and Class Members' knowledge

---

[14] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).
[15] *Meta Reports Fourth Quarter and Full Year 2023 Results*, Facebook https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx (last visited Aug. 8, 2024).
[16] *What's your data really worth? (2025 update) | Proton*, https://proton.me/blog/what-is-your-data-worth (last visited Sept. 8, 2025).

AMENDED CLASS ACTION COMPLAINT

or authorization.

45.    The Google trackers allow Defendant to track and share with Google (1) who uses UWM's Website; (2) whether the user is a customer of UWM; (3) what actions the user performs on the Website such as what types of products the customer is viewing as well as the customer's selections on those pages, including the reason for the user's request; (4) when users visit the Website; (5) where on the website users perform these actions; and (6) how users navigate through the website to perform these actions. Google gathers this information using trackers embedded on UWM's Website and generates corresponding reports.[17] DoubleClick,[18] Google Tag Manager,[19] and Google Analytics[20] and Google Ads are used by Google to collect all of this. Google's collection of this data "enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[21] On information and belief, the data UWM sends to Google trackers CNB installed, which include Google Analytics ID UA-22568213-2 ("GA1"), Google Analytics ID UA-32813073-1 ("GA2"), and Google Tag Manager container with ID GTM-WNQS35 ("GTM1"), include cookies which are used by Google to identify and track users across websites.

46.    The Microsoft tracker, which includes Microsoft's Azure Application Insights,

---

[17] *See generally*, *A big list of what Google Analytics can & cannot do*, MarketLyrics, avail. at https://marketlytics.com/blog/list-of-things-google-analytics-can-and-cannot-do/.

[18] *See the DoubleClick Digital Marketing Suite,* Google Developers, https://developers.google.com/app-conversion-tracking/third-party-trackers/doubleclick (last accessed May 12, 2025).

[19] *See Your guide to Google Tag Manager*, GOOGLE SUPPORT, https://support.google.com/tagmanager/answer/12811173?hl=en (last accessed May 27, 2025).

[20] *See How Google Analytics works*, GOOGLE SUPPORT, https://support.google.com/analytics/answer/12159447?hl=en (last accessed May 27, 2025).

[21] *See DoubleClick Digital Marketing*, Google Help, https://support.google.com/faqs/answer/2727482?hl=en (last accessed May 12, 2025).

allows Defendant to "[t]rack what your customers are doing after they click on your ad."[22]
According to Microsoft, the tracker "records what customers do on your website . . . [and] will
collect data that allows you to track conversion goals and target audiences with remarketing
lists."[23]

47.    Furthermore, Defendant utilized LinkedIn trackers. "LinkedIn analytics is a
collection of metrics that measure the effectiveness of your posts, updates and strategy on the
platform. It's statistical data that enhances your LinkedIn marketing efforts."[24] Like the Google
trackers, the LinkedIn trackers record events that include data such as users' IP addresses, cookies,
and browser fingerprints, which include information such as the browser version, screen
resolution, device type, processor architecture, and other identifying characteristics, which
information can be used to identify specific users.

48.    The CrazyEgg tracker Defendant used "tracks and optimizes website visitor
behavior so you can …boost your bottom line."[25]

49.    Defendant also added a lordofthesuperfrogs.com script. On information and belief,
this code reports to Cheq. Cheq is designed to "[p]rotect paid marketing campaigns across ad
platforms," "[c]entralize privacy management," and "[i]ncrease [] inbound paid marketing
qualified leads."[26]

---

[22]        *Microsoft                Advertising*,        Microsoft.com,
https://about.ads.microsoft.com/en/tools/performance/conversion-
tracking#:~:text=Universal%20Event%20Tracking%20(UET)%20is,target%20audiences%20wit
h%20remarketing%20lists (last visited June 26, 2024).
[23] *Id.*
[24] SproutSocial, Rana Bano, March 5, 2024, *LinkedIn analytics: The complete guide for
tracking metrics in 2024,* avail. at https://sproutsocial.com/insights/linkedin-analytics/ (last acc.
Aug. 8, 2024).
[25] *See Crazy Egg FAQ*, https://www.crazyegg.com/faq (last visited Mar. 17, 2025).
[26] *The Global Leader in Go-to-Market Security | CHEQ*, https://cheq.ai/ (last visited Mar.
17, 2025).

50.    The Dynatrace tracker Defendant installed feeds collected Customer information through an Artificial Intelligence to analyze Customer behavior.[27] Dynatrace integrates with over 750 companies, including Microsoft and Google.[28]

51.    The collection and disclosure of users' data via these trackers occurs automatically.

52.    Upon information and belief, every page in the application flow on Defendant's website includes trackers that collected and shared events that include the user's IP addresses, browser fingerprints, and cookies.

**C. UWM Used Trackers to Disclose Personal and Financial Information Without Users' Authorization.**

53.    On information and belief, UWM installed each of these trackers, through which UWM transmitted Customers' communications with UWM's website and thus their Personal and Financial Information to the Third Parties without Customers' knowledge or authorization. This information included their browsing activities including the pages they viewed and the buttons they clicked; information revealed in the application process regarding the user's status as a customer; when the customer logged in to UWM's website; the user's browsing activities and website behaviors, including that the user clicked certain buttons and what URLs or webpages they led to; the pages users visited; that a user was on a mortgage account login page; that a user is viewing their loans after logging in; and the different types of statements that a user viewed.

54.    On information and belief, January 8, 2012, and at least as recently as May 21, 2025, UWM has had tracking technologies installed on its Website.

55.    Accordingly, UWM disclosed its Customers' data and Personal and Financial

---

[27] *Dynatrace | Understand your business like never before*, https://www.dynatrace.com/ (last visited June 17, 2025).

[28] *Dynatrace Hub | All*, https://www.dynatrace.com/hub/?filter=all (last visited June 17, 2025).

Information to the Third Parties, like Facebook, beginning some time prior to January 2012 and continuing up until at least May 2025.

56.     The information and data collected by these trackers allowed Third Parties like Meta, Google, and Microsoft to identify individual users and link those Customers to other online accounts, such as the Customer's Facebook account.

     *i.*    *UWM Installed Trackers to Collect and Disclose Customers' Browsing Activities Across its Website.*

57.     UWM first installed a tracker by January 8, 2012 when it added a Google Analytics tracker with ID UA-22568213-2 ("GA1") to its website. Around November 2012, UWM replaced GA1 with a Google Analytics tracker with the ID UA-32813073-1 ("GA2").

58.     By August 21, 2015 UWM added the Google Tag Manager container with ID GTM-WNQS35 ("GTM1") to its website.

59.     By August 30, 2017 UWM published version 133 of GTM1 which was configured to enable Google Ads and install CrazyEgg.

60.     By July 23, 2020, UWM had added a Microsoft Universal Events tracker to its website.

61.     Next, by July 13, 2022, UWM added a script from lordofthesuperfrogs.com to GTM1. There is evidence to suggest that this script is collecting substantial user data and providing it to an unidentified third-party. On information and belief this third party is Cheq.

62.     Accordingly, UWM has disclosed users' data to Google since at least January 2012 and on information and belief continues to do so today. UWM further disclosed user's website behaviors to Microsoft from at least July 2020 through December 2024. UWM has also sent users' data to an unidentified party via the lord of the super frogs script since July, 2022. Finally, UWM added a Meta Pixel sometime after July 2024.

63.     Currently, UWM disclosures about users begin when users load UWM's homepage. As soon as a user opens UWM's homepage, UWM sends events to Google, LinkedIn, Dynatrace, Lord of the Super Frogs, and Facebook, reporting that the user is on the page, "https://www.uwm.com/."

64.     Then, when the user clicks to log into their account, UWM sends an event to LinkedIn revealing that the user clicked to "Log In." UWM also sends additional events to Google, Dynatrace, LinkedIn, and Lord of the Super Frogs disclosing that the user is on the page, "https:www.uwm.com/login."

*ii.    UWM Installed Trackers to Track and Disclose Customers' Activities When they Log In to UWM's Website*

65.     Once a user lands on the page to log into their mortgage account, UWM informs Google and Microsoft that the user is on a page entitled "Mortgage Account Login, Sign In."

66.     On this page, the user may enter their username and password to log in. UWM informs Google when the user selects the field to input their username on the login page, disclosing that the user is filling out their "Username" on a form.

67.     Next, as the user clicks to submit their username and password to log in, UWM sends another event to Google, reporting that the user submitted their form on the "Mortgage Account Login, Sign In" page.

68.     Upon the user's sign-in, UWM presents an overview of the user's loans with UWM. Here, UWM informs Google that the user is viewing their UWM "Loan Overview."

69.     Once logged in, the user can view their statements organized by category, including payments, monthly statements, tax documents, escrow statements, and miscellaneous items. UWM reports each time the user accesses the different types of statements, disclosing to Google that the user is viewing their "Payment Activity", "Monthly Statements", "Tax Statements", "Escrow

Statements", and "Miscellaneous Statements", respectively. Each of these events report that the user visited the particular page.

70.    Similarly, on information and belief, the lordofthesuperfrogs.com tracker is present on these pages as well. Due to the highly obfuscated nature of the code, it is impossible to tell exactly what data is being transferred and to whom, but on information and belief and associated network traffic, it appears this script is collecting substantial user data and sending it to a third party.

**D. UWM Uses Ambiguous, Disingenuous, and Deceptive Privacy Policies That Fail to Sufficiently Disclose or Notify Customers of Defendant's Data Sharing.**

*i.    UWM's Privacy Representations*

70.71.  Customers never consented, agreed, authorized, or otherwise permitted Defendant to intercept their Personal and Financial Information or to use or disclose it for marketing and profit purposes. Customers were never provided with any written notice that Defendant disclosed their Personal and Financial Information to Third Parties (who then allowed fourth parties to use it for profit).

71.72.  Customers relied on Defendant to keep their Personal and Financial Information confidential and securely maintained and to use this information only for the purpose of providing legitimate financial services. Customers relied on Defendant to make only authorized disclosures of this information.

72.73.  Furthermore, Defendant actively misrepresented it would preserve the security and privacy of Customers' Personal and Financial Information.

~~73.~~74.  The contracts that UWM has with its Customers include its "Terms of Use"[29] and "Privacy Policy,"[30] (collectively, "Privacy Contracts").

~~74.~~75.  UWM tells customers that "UWM understands the need to safeguard your information from unauthorized use and disclosure."[31]

~~75.~~76.  UWM represents that it may use the information it collects:

- to improve its products and services
- to periodically market its products and services, telemarket its products and services, and send promotional emails and advertisements to you
- to contact you
- to perform services you request of UWM including but not limited to reviewing credit worthiness for requested loan approval, service your UWM loan, respond to your inquiries/requests, underwrite your loan application, review your account for possible loan modification
- to complete any other task requested of UWM or necessary to perform the underlying services for which you have contacted UWM directly or indirectly via your loan officer[32]

~~76.~~77.  UWM tells its Customers that they can opt-out of these disclosures: "If you do not wish to receive information regarding UWM products and services, you may opt-out during your account registration, within any future communications or by sending an Email to info@uwm.com."[33] Despite this representation, Customers may not opt-out of the automatic transmission of their information via the trackers Defendant installs.

~~77.~~78.  UWM further represents to Customers:

- "There are situations when we disclose your information to third parties. For example, we may share your email address and other personal information with mortgage brokers regarding mortgage

---

[29] *Terms of Use* (Exhibit A).
[30] *Privacy Policy*, https://www.uwm.com/privacy-policy (last visited June 17, 2025) (attached as Exhibit B).
[31] *Terms of Use*.
[32] *Privacy Policy*.
[33] *Id.*

AMENDED CLASS ACTION COMPLAINT

products that may be available to you."

- "UWM has measures in place directed to safeguarding the information you provide. Such measures include, but are not limited to, implementing policies and procedures regarding data security."

- "For certain aspects of the loan process and to provide certain services to you, UWM employs or utilizes service providers including, but not limited to, appraisal management companies, title companies, closing attorneys, due diligence firms, sub-servicers, consultants, temporary workers, attorneys, third-party developers and technology companies and others as necessary. For example, we may utilize service providers to send Emails to you. In order for service providers to assist UWM, we may need to share your personally identifiable information. Service providers are not authorized and are strictly prohibited from utilizing your personally identifiable information for any purpose other than those proscribed by UWM in connection with the services they provide on UWM's behalf. There are situations when we disclose your information to third parties. For example, we may share your email address and other personal information with mortgage brokers regarding mortgage products that may be available to you."

- "Website Usage Data: Our websites may track usage data, including but not limited to, your IP address, your page views and links clicked, your browser type and version, and other aspects of how you interact with UWM's websites. UWM utilizes this information in the aggregate and on an individual level to better understand how our website is being used, to improve site offerings, for troubleshooting and other issue resolution purposes. This data may also be utilized to help UWM provide coaching on the various tools the site has to offer and provide you with a more personalized website experience or assist with technical support questions. We may also utilize it to send you specific offers or promotions. If you do not wish to receive offers or promotions, simply indicate your preferences through your online account or send an Email to info@uwm.com. You can also follow the instructions at the bottom of any particular Email from UWM to manage your notification preferences. Again, UWM does not share your information with third-party companies for their marketing or promotional use and we do not track URLs that you type into your browser, nor do we obtain any information about your usage across the internet once you leave UWM's websites."

78.79.  UWM states no less than five times, in clear and unequivocal language, that it does not sell Customer information or share it with third parties for marketing purposes:

- "UWM does not sell your personal information and only discloses

21

to third-parties who are performing services on behalf of UWM or assisting UWM with another business need or purpose."

- "Again, UWM does not share your information with third-party companies for their marketing or promotional use."
- "UWM does not sell your personal information and only discloses to third-parties who are performing services on behalf of UWM or assisting UWM with another business need or purpose."
- "If you would like additional information about what personal information UWM collects and how it is used, disclosed, and sold (UWM does not sell your personal information)…"
- "You have the right to … opt-out of "sales" of personal information (UWM does not sell your personal information)"

79.80.  UWM never warned Customers that (1) Third Parties like Facebook, Google, or Meta will use cookies or trackers to obtain the confidential Personal and Financial Information that Customers provided to UWM; or (2) that UWM would share Customers' Personal and Financial Information with Third Parties to enable Third and Fourth parties to market Third and Fourth-Party products to Plaintiff and the Class that are unrelated to the mortgage services UWM offers.

80.81.  Customers reasonably understand that UWM will securely maintain their Personal and Financial Information entrusted to it and protect that information from being shared or utilized by Third Parties (and fourth parties) that have nothing to do with UWM or its services. UWM's Consumer Privacy Contracts only reinforced this reasonable understanding.

81.82.  In contrast to this reasonable understanding, UWM indiscriminately shares Personal and Financial Information with nonaffiliated Third Parties, without Customers' consent and for Third Party and fourth party marketing purposes that have nothing to do with servicing consumers' UWM accounts.

ii.      *Third-Parties Further Share the Data and Information Collected from Trackers Installed on UWM's Website with Fourth Parties.*

82.83.  In addition to using the data for their own purposes, the third parties that obtain

Customer data and information from trackers installed on UWM's website further profit from UWM's improper sharing practices by selling Customers' data to fourth parties.

83.84.  As one study found, "on average, companies that allow external sharing of [] data assets have data that has been exposed to 42 4th-party domains."[34]

84.85.  Consequently, a fourth party that did not have a tracker directly installed on the UWM's website may obtain and use information collected via third-party trackers to provide direct advertisements to Customers on the fourth party's platform.

85.86.  One common recipient of Customers' collected data is Facebook.

86.87.  For example, Facebook and Google have engaged in practices that allowed for the sharing or accessibility of user data between their platforms.[35] Because of this, advertisements on Facebook may reflect information collected via a Google tracker, either because of information shared directly or indirectly between the companies.

88.    A data broker is a company that collects and sells personal information about individuals to other businesses.  Data brokers gather consumers' personal information from a variety of sources, and then compile comprehensive profiles they sell for purposes such as targeted

---

[34] Adam Gavish, *Your 3rd Party Collaborators Share Your Company's Data with 4th Parties*, DOCONTROL (Feb. 27, 2025), https://www.docontrol.io/blog/your-3rd-party-collaborators-share-your-company-data-with-4th-parties#:~:text=What%20is%204th%2DParty%20Data,side%20effect%20of%20SaaS%20collaboration.

[35] *See* Steven Musil, *Facebook gave tech giants more access to users data than it said*, CBSNEWS (Dec. 19, 2018), https://www.cbsnews.com/news/facebook-gave-tech-giants-more-access-to-users-data-than-it-said-new-york-times/ (last visited Apr. 24, 2025); Steven Musil, *Facebook acknowledges it shared user data with dozens of companies* (Jul. 1, 2018), https://www.cnet.com/tech/tech-industry/facebook-acknowledges-it-shared-user-data-with-dozens-of-companies/ (last visited Apr. 24. 2025); Paresh Dave and Katie Paul, *Google secretly gave Facebook perks, data in ad deal* (Dec. 17, 2020), https://www.reuters.com/article/technology/google-secretly-gave-facebook-perks-data-in-ad-deal-us-states-allege-idUSKBN28Q37G/ (last visited Apr. 24, 2025).

advertising, risk assessment, and background checks.  Data brokers mass collection and sale of personal information raise significant consumer privacy concerns.  The personal data that data brokers collect and sell can be used to harm individuals, for example, by influencing insurance rates, loan denials, and unwanted advertising.

89.    Both Facebook and Google have a history of sharing the data they receive via analytics technologies with data brokers.  For example, when advertisers use Google's real-time bidding system (RTB), RTB lets hundreds of companies bid for ad space on individual consumers based on their Google profile, which can include information such as age, sex, and interests.  While only one company will win the auction, hundreds of participating companies receive sensitive information about the potential recipient of the ad—device identifiers and cookies, web browsing and location data, IP addresses, and unique demographic information such as age and gender.  Worse, many companies participating in the RTB system are not there to fill ad spaces but instead use RTB to collect users' personal data.  Likewise, for users using cell phones or other Android devices that run on a Google operating system, every time they open an app on their Android phone or tablet, Google will timestamp it, and every ad the user is shown will be recorded and associated with their device profile.

90.    Facebook is no better.  Facebook has historically collaborated with data brokers to gather consumer data and enhance its user profiles for targeting advertising.  Facebook itself acts as a first-party data broker, collecting data from user activities on its platform to offer targeted advertising, which is its primary revenue source.  Facebook's data ecosystem extends through external partnerships, allowing Facebook to collect data from user interactions on other websites and apps.  Companies that pay for ads on Facebook can then direct users to their websites, which embed trackers that collect information such as IP addresses and device IDs from visitors.

AMENDED CLASS ACTION COMPLAINT

91.    Facebook also has a history of sharing its customers data with third parties, including most infamously Cambridge Analytica, who gained access to the data of tens of millions of Facebook users.  Facebook has also shared its customers data with "partners," such as Acxiom, Oracle, Epsilon, and Experian.  Once this data is shared, neither Facebook or its users have control over this data as it is endlessly sold and resold to data brokers around the world.

92.    The only remedy for users whose information has been shared with Google is to use services such as DeleteMe and CyEx Privacy Shield Pro that go out into the online market place and "delete" users' personal data from data broker rolls.  These services, however, cost anywhere from $100 to $300 a year on average for consumers to try and regain control over their personal information.

87.93.  Facebook and Google both act as data brokers, meaning they collect data, compile it into datasets, and sell it to third parties.[36] Two other popular data brokers are Acxiom and Oracle Data Cloud ("Oracle"). Facebook and Google have been known to buy information from, and sell information to, such data brokers.[37]

88.94.  Because of this, one company's tracker (e.g., Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a third-party (e.g., Facebook), which uses the information to advertise for various parties (like other

---

[36] *See* Jessie G Taft, *Facebook and Google Are the New Data Brokers* (Dec. 18, 2018, updated Jan. 5, 2021), https://dli.tech.cornell.edu/post/facebook-and-google-are-the-new-data-brokers (last visited Apr. 24. 2025).

[37] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/ (last visited Apr. 24. 2025).

financial institutions) on its own platform.[38] Alternatively, one company's tracker (e.g., Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a fourth-party advertiser (e.g., another financial institution), which uses the information to advertise for on other platforms (e.g., Facebook).[39] Or, one company's tracker (e.g., Google Analytics) may collect information, sell either the raw data or a compiled dataset to a third-party data broker (e.g., Acxiom or Oracle), which third party data broker sells the information to a fourth party (e.g., Facebook), which uses the information for still other parties' targeted advertising.[40] In any event, the basic idea and results are the same. Google Analytics tracks and discloses information to fourth parties that use that data and information to advertise a variety of products on a variety of platforms.

89.95.  The information that data brokers like Acxiom and Oracle buy and compile from trackers (like Facebook's and Google's tackers) is inherently sensitive.

### E.  UWM Violated the GLBA, FTC Standards, and Related Regulations

90.96.  As a financial institution, UWM is subject to the GLBA. 15 U.S.C. § 6809(3)(A) (a "financial institution" is "any institution the business of which is engaging in financial activities..."). Defendant recognizes this, noting, "If you have a mortgage or an application with us, the information we have about you is protected under federal privacy laws—such as the Gramm Leach Bliley Act and the Fair Credit Reporting Act. It is therefore excluded from state privacy

---

[38] *See* Don Marti, *et. al.*, *Who Shares Your Information With Facebook?* at 16 (Jan. 2024), https://innovation.consumerreports.org/wp-content/uploads/2024/01/CR_Who-Shares-Your-Information-With-Facebook.pdf (explaining how Facebook uses aggregated data from external data brokers to target users on its platform).

[39] *Id.*

[40] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/.

laws, and not covered by the disclosures below."[41]

91.97.   Pursuant to the GLBA, "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

92.98.  The FTC has interpreted Section 5 of the FTC Act, 15 U.S.C. § 45, to include compliance with the GLBA Privacy Rule, 16 C.F.R. § 313.1, *et seq*. The FTC consistently enforces the GLBA Privacy Rule, as failure to comply with the GLBA Privacy Rule is an unfair act or practice prohibited by Section 5 of the FTC Act.[42]

93.99.   The GLBA Privacy Rule is a regulation that "governs the treatment of nonpublic personal information about consumers by the financial institutions." 16 C.F.R. § 313.1 *et seq*.

94.100.       Pursuant to the GLBA Privacy Rule, "[a] financial institution must provide a notice of its privacy policies and practices with respect to both affiliated and nonaffiliated third parties, and allow the consumer to opt out of the disclosure of the consumer's nonpublic personal information to a nonaffiliated third party if the disclosure is outside of the exceptions."[43] UWM consistently fails to do this.

95.101.       The GLBA Privacy Rule, defines sensitive information that should not be indiscriminately disclosed:

(n)       (1) Nonpublic personal information means:
                (i) Personally identifiable financial information; and

---

[41]   *State   Consumer   Privacy   Act   Laws   –   FAQ*,   UWM, https://www.mrcooper.com/privacy/state (last accessed May 12, 2025).
[42]   *See How to Comply with the Privacy Rule*, https://www.ftc.gov/business-guidance/resources/how-comply-privacy-consumer-financial-information-rule-gramm-leach-bliley-act ("The FTC may bring enforcement actions for violations of the Privacy Rule.").
[43]   *See* FTC, *Financial Privacy Rule*, https://www.ftc.gov/legal-library/browse/rules/financial-privacy-rule (last visited August 8, 2024).

(ii) Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.…

(3) Examples of lists—

(i) Nonpublic personal information includes any list of individuals' names and street addresses that is derived in whole or in part using personally identifiable financial information (that is not publicly available), such as account numbers.…

(o) (1) Personally identifiable financial information means any information:

(i) A consumer provides to you to obtain a financial product or service from you;

(ii) About a consumer resulting from any transaction involving a financial product or service between you and a consumer; or

(iii) You otherwise obtain about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—

(i) Information included. Personally identifiable financial information:

(A) Information a consumer provides to you on an application to obtain a loan, credit card, or other financial product or service;

(B) Account balance information, payment history, overdraft history, and credit or debit card purchase information;

(C) The fact that an individual is or has been one of your customers or has obtained a financial product or service from you;

(D) Any information about your consumer if it is disclosed in a manner that indicates that the individual is or has been your consumer;

(E) Any information that a consumer provides to you or that you or your agent otherwise obtain in connection with collecting on, or servicing, a credit account;

(F) Any information you collect through an Internet "cookie" (an information collecting device from a web server); and

(G) Information from a consumer report.

16 C.F.R. § 313.3

96. 102.      The information that UWM disclosed to Third Parties via trackers—including *e.g.*, information revealed in the application process regarding the user's status as a customer; when the customer logged in to UWM's website; the user's browsing activities and

website behaviors, including that the user clicked certain buttons and what URLs or webpages they led to; the pages users visited; that a user was on a mortgage account login page; that a user is viewing their loans after logging in; and the different types of statements that a user viewed (all of which is information UWM obtained from the Customer in connection with providing financial products and services)—is "nonpublic personal information" under the GLBA and related regulations. 16 C.F.R. § 313.3.

97.103.        UWM has utterly failed to meet its privacy obligations under the GLBA: it has explicitly disclosed Customers' nonpublic personal information and Personal and Financial Information to Third Parties for marketing and advertisement, including for Third Party and fourth party advertising use.

98.104.        UWM fails to meet its notice obligations under the GLBA. "[A] financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title." 15 U.S.C.A. § 6802. As outlined at length above, UWM's Privacy Policies fail to put Customers on notice as required here and actually promise that Customers' Personal and Financial Information will not be shared with Third Parties (and fourth parties) for targeted advertising purposes.

99.105.        For example, by not including in its Privacy Policies that it discloses Customers' Personal and Financial Information to Third Parties for their use in their own advertising and marketing, the Privacy Policies fail to properly disclose:

> (1) the policies and practices of the institution with respect to disclosing nonpublic personal information to nonaffiliated third parties . . . including []the categories of persons to whom the information is or may be disclosed, other than the persons to whom the information may be provided [and] the policies and practices of the institution with respect to disclosing of nonpublic personal

information of persons who have ceased to be customers of the financial
institution . . .

(2) the categories of nonpublic personal information that are collected by the
financial institution; [and]

(3) the policies that the institution maintains to protect the confidentiality and
security of nonpublic personal information

15. U.S.C.A. § 6803.

~~100.~~106.        As detailed above, UWM also fails to meet its opt out obligations under the
GLBA. The GLBA Privacy Rule requires financial institutions to, for example, "provide an opt
out notice" to Customers, which notice "must state…[t]hat the consumer has the right to opt out
of that disclosure [and] [a] reasonable means by which the consumer may exercise the opt out
right." 16 C.F.R. § 313.7. Under the GLBA, UWM

may not disclose nonpublic personal information to a nonaffiliated third party
unless—
  (A) [it] clearly and conspicuously discloses to the consumer. . . that such
information may be disclosed to such third party;
  (B) ***the consumer is given the opportunity***, before the time that such
information is initially disclosed, ***to direct that such information not be
disclosed to such third party***; and
  (C) the consumer is given an explanation of how the consumer can exercise
that nondisclosure option.

15 U.S.C.A. § 6802 (emphasis added).

~~101.~~107.        UWM fails to meet its opt out obligations because, as outlined above, UWM
does not clearly and conspicuously disclose to Customers its Disclosure of their Personal and
Financial Information to Third Parties.

~~102.~~108.        UWM further fails to meet its opt out obligations because Customers are
not provided an opportunity before disclosure to direct the nondisclosure of their information—as
described above, UWM instantaneously discloses information when Customers visit its Website.

~~103.~~109.        By perpetually disclosing its customers' Personal and Financial Information
to third parties without consent, UWM failed and continues to fail to meet its obligations under

the GLBA, FTC standards, and related regulations, to establish appropriate standards and safeguards relative to Customers' Personal and Financial Information.

**F.  Plaintiffs' Experiences**

*i.      Plaintiff Allison*

~~104.~~110.      Plaintiff Ethan Allison applied for a mortgage through a mortgage broker. When it was approved in or around February 2021, he went to UWM's Website and created an account. UWM later sold his mortgage account.

~~105.~~111.      When his mortgage was through UWM, Plaintiff Allison regularly used UWM's Website to review his account, manage his mortgage, check statements, and make payments. Plaintiff Allison last used UWM's Website in or around March 2025, when he accessed a tax form related to his mortgage with UWM.

112.     Plaintiff Allison inputted his information in UWM's website, for example in 2021 to apply for a mortgage. He provided his SSN, contact information, address, credit information, financial account information, and DOB on Defendant's Website.

~~106.~~113.      Plaintiff Allison is a Facebook user.

~~107.~~114.      Beginning around the same time Plaintiff Allison used Defendant's Website, he began receiving advertisements on his Facebook feed related to loans, mortgages, and refinancing options~~.~~, reflecting the information he input on Defendant's Website. Plaintiff Allison has consistently seen these ads since visiting UWM's Website.

*ii.     Plaintiff Caloca*

~~108.~~115.      Plaintiff Mark Caloca has had several mortgages with UWM since 2020. He owns several properties, both personal and investment. At various times, UWM has bought out several of his mortgages and occasionally re-sold them. UWM bought one of Plaintiff Caloca's

properties in or around 2020 and another in or around 2024. After UWM obtained one of his mortgages, Plaintiff Caloca began using Defendant's Website, and has had an account with UWM since 2020.

109.116.        Plaintiff Caloca regularly uses UWM's Website to review his account, manage his mortgage, and make payments.

117.        When Plaintiff Caloca obtained a loan from the website, he input all the information needed to obtain a loan into the website, including SSN, address, credit history, financial information, DOB, and contact information.

110.118.        Plaintiff Caloca is a Facebook user.

111.119.        Beginning around the same time Plaintiff Caloca used Defendant's Website, he began receiving advertisements on Facebook and Google regarding refinancing and loan ads, including ads for UWM, Mr. Cooper, and Sehllback. Plaintiff Caloca has seen advertisements regularly since using UWM's Website., reflecting the Personal and Financial information he input on Defendant's Website.

112.120.        Plaintiffs accessed Defendant's Website at Defendant's direction and encouragement.

113.121.        Plaintiffs relied on Defendant's Website to communicate Personal and Financial Information and did so with the understanding that UWM would not share their Personal and Financial Information except as agreed in the Privacy Policies.

114.122.        At no point did Customers like Plaintiffs sign any written authorization permitting Defendant to send their Personal and Financial Information to Third Parties (or fourth parties) uninvolved in providing them with financial or mortgage services.

115.123.        Plaintiffs reasonably expected that their communications with UWM were

confidential, solely between each Plaintiff and UWM, and that, as such, those communications and any Personal and Financial Information submitted would not be transmitted to or intercepted by a third party (or used by a fourth party).

116.124.    Plaintiffs provided their Personal and Financial Information to Defendant and trusted that the information would be safeguarded according to UWM's promises and the law.

117.125.    Had they been aware of UWM's sharing practices, Plaintiffs would not have authorized UWM to make their Personal or Financial Information available for sale on the resale market.

118.126.    Plaintiffs never intended to let UWM benefit from their Personal and Financial Information.

119.127.    Through the systematic data sharing process described in this complaint, Plaintiffs' interactions with UWM's online financial platform were disclosed to third parties, including Facebook. Plaintiffs did not consent to those disclosures.

120.128.    On information and belief, through its use of Third Party trackers on its Website, Defendant disclosed to Third Parties information Plaintiffs provided to UWM as a financial institution and resulting from a transaction for Plaintiffs to obtain or access Defendant's mortgage services, including each Plaintiff's:

a.    Existing user or Customer status;

b.    Browsing activities, including the pages and content Plaintiffs viewed;

c.    Login activities;

d.    Activities related to viewing their loans;

e.    The different types of statements they viewed;

f.    c_user cookie to identify a logged-in Facebook account; and

g.     Information collected through an Internet "cookie" (or information collecting device from a web server).

~~121.~~129.     By failing to receive the requisite consent, UWM breached confidentiality and unlawfully disclosed Plaintiffs' Personal and Financial Information.

~~122.~~130.     Plaintiffs would not have submitted their information to UWM if they had known it would be shared with Third Parties and further sold to fourth parties for purposes of marketing Third and fourth party products.

~~123.~~131.     As a result of UWM's Disclosure of Plaintiffs' Personal and Financial Information via the Meta Pixel and other tracking technologies to Third Parties (and fourth parties) without authorization, Plaintiffs were harmed in the following ways:

a.     Loss of privacy;

b.     Unauthorized disclosure of their Personal and Financial Information;

c.     Unauthorized access to their Personal and Financial Information by Third Parties;

d.     UWM benefited from the use of Plaintiffs' Personal and Financial Information without sharing that benefit with Plaintiffs;

e.     Repeated targeted advertisements from Third and fourth parties on social media and other third-party websites, reflecting Plaintiffs' Personal and Financial Information that was improperly disclosed and used;

f.     Lost benefit of their bargain with UWM, as Plaintiffs did not receive the reasonable privacy and data security protections for which they paid;

g.     UWM enriched itself at Plaintiffs' expense without sharing the revenue and profit attributable to collecting Plaintiffs' Personal and Financial Information without authorization and sharing it with Third Parties (and fourth parties);

h.      UWM profited off of disclosing Plaintiffs' Personal and Financial Information without authorization and sharing it with Third Parties (and fourth parties) through savings in marketing costs;

i.      UWM profited as a result of collecting Plaintiffs' Personal and Financial Information without authorization and sharing it with Third Parties (and fourth parties) through its revenues and profits attributable to serving and monetizing advertisements directed to Plaintiffs;

j.      Plaintiffs lost their ability to keep their Personal and Financial Information private or allow UWM to track their data;

k.      Embarrassment, humiliation, frustration, and emotional distress;

l.      Decreased value of Plaintiffs' Personal and Financial Information;

m.      Increased risk of future harm resulting from future use and disclosure of their Personal and Financial Information; and

n.      Statutory damages.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

~~124.~~132.      The applicable statutes of limitation have been tolled as a result of UWM's knowing and active concealment and denial of the facts alleged herein.

~~125.~~133.      UWM seamlessly incorporated trackers into its Website while providing Customers using those platforms with no indication that their Website usage was being tracked and transmitted to Third Parties. UWM knew that its Website incorporated trackers, yet it failed to disclose to Plaintiffs and Class Members that their sensitive Personal and Financial Information would be intercepted, collected, used by, and disclosed to Third Parties.

~~126.~~134.      Plaintiffs and Class Members could not with due diligence have discovered

the full scope of UWM's conduct, because there were no disclosures or other indication that they were interacting with websites employing tracking technology to unauthorizedly disclose their Personal and Financial Information to unaffiliated Third Parties or that their information would subsequently be sold to fourth parties for the purpose of marketing third and fourth party products.

127.135.     All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. UWM's illegal interception and disclosure of Plaintiffs' and the Class's Personal and Financial Information has continued unabated. What is more, UWM was under a duty to disclose the nature and significance of its data collection practices but did not do so. UWM is therefore estopped from relying on any statute of limitations defenses.

## **CLASS ACTION ALLEGATIONS**

128.136.     Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all other similarly situated persons pursuant to Fed. R. Civ. P. 23.

129.137.     Plaintiffs seek to represent the following classes:

**Nationwide Class**: All individuals in the United States who have had or applied for mortgage services with UWM within the applicable statute of limitations and whose Personal and Financial Information was disclosed by Defendant to Third Parties through Defendant's Website's tracking technology without authorization.

**California Subclass**: All citizens of California who have had or applied for mortgage services with UWM within the applicable statute of limitations and whose Personal and Financial Information was disclosed by Defendant to Third Parties through Defendant's Website's tracking technology without authorization.

130.138.     Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

131.139.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

132.140.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23(a)(1)-(4).

133.141.    Numerosity: Class Members are so numerous and geographically dispersed that joinder of all members is impracticable. Upon information and belief, there likely millions of individuals throughout the United States whose Personal and Financial Information has been improperly used or disclosed by Defendant, and the Classes are identifiable within Defendant's records.

134.142.    Ascertainability. Class Members are readily identifiable from information in Defendant's possession, custody, and control.

135.143.    Commonality and Predominance: Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.  Whether Defendant disclosed Class Members' Personal and Financial Information to Third Parties;

b.  Whether Class Members consented to Defendant's disclosure of their Personal and Financial Information;

c.  Whether Defendant owed duties to Plaintiffs and Class Members to protect their Personal and Financial Information;

d.  Whether Defendant breached its duty to protect Plaintiffs' and Class Members' Personal and Financial Information;

e.  Whether Defendant's disclosure of Plaintiffs' and Class Members' Personal and

37

Financial Information to Third Parties violated federal, state and local laws, or industry standards;

f.  Whether Defendant's failure to allow Customers a meaningful opportunity to opt out of sharing with Third Parties violated federal, state and local laws, or industry standards;

g.  Whether Defendant's conduct resulted in or was the actual cause of the disclosure of Plaintiffs' and Class Members' and Personal and Financial Information;

h.  Whether Defendant's conduct resulted in or was the proximate cause of the disclosure of Plaintiffs' and Class Members' Personal and Financial Information;

i.  Whether Defendant has a contractual obligation to protect Plaintiffs' and Class Members' Personal and Financial Information and whether it complied with such contractual obligation;

j.  Whether Defendant has a duty of confidence and whether it complied with such obligation;

k.  Whether Defendant's conduct amounted to violations of state consumer protection statutes;

l.  Whether Defendant's conduct amounted to violations of state and federal wiretap statutes;

m.  Whether Defendant's conduct amounted to violations of other California state laws;

n.  Whether Defendant should retain Plaintiffs' and Class Members' valuable Personal and Financial Information;

o.  Whether, as a result of Defendant's conduct, Plaintiffs and Class Members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such

relief.

136.144.      Defendant has engaged in a common course of conduct toward Plaintiffs and the Class Members, in that the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully disclosed and accessed in the same way. As set forth above, the common issues arising from Defendant's conduct affecting Class Members predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

137.145.      Typicality: Plaintiffs' claims are typical of those of other Class Members because all had their Personal and Financial Information compromised as a result of Defendant's use and incorporation of Meta Pixel, Google Pixel, Microsoft Pixel, and other tracking technology.

138.146.      Policies Generally Applicable to the Classes: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

139.147.      Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiffs have suffered is typical of other Class Members. Plaintiffs have also retained counsel experienced in

complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

140.148.    Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

141.149.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

142.150.    The litigation of the claims brought herein is manageable. Defendant's

uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

143.151.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

144.152.     Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure and failure to properly secure the Personal and Financial Information of Plaintiffs and the Class Members, Defendant may continue to refuse to provide proper notification to and obtain proper consent from Class Members, and Defendant may continue to act unlawfully as set forth in this Complaint.

145.153.     Moreover, Defendant has acted or refused to act on grounds generally applicable to the Classes, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Classes is appropriate.

146.154.     Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

    a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Personal and Financial Information;

    b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Personal and Financial Information;

c.  Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of customer information;

d.  Whether Defendant was negligent and/or negligent *per se*;

e.  Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that contract;

f.  Whether Defendant breached the contract;

g.  In the alternate, whether Defendant was unjustly enriched;

h.  Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Personal and Financial Information had been used and disclosed to Third Parties and used for Third Party and fourth parties' benefit;

i.  Whether Defendant failed to implement and maintain reasonable security procedures and practices;

j.  Whether Defendant invaded Plaintiffs and the Class Members' privacy;

k.  Whether Defendant breached its implied duty of confidentiality; and,

l.  Whether Plaintiffs and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

147.155.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

148.156.    Plaintiffs and Class Members submitted sensitive nonpublic personal information, including Personal and Financial Information, when accessing UWM's Website.

149.157.    Defendant owed to Plaintiffs and Class Members a duty to exercise

42

reasonable care in handling and using Plaintiffs' and Class Members' Personal and Financial Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from disclosure and unauthorized transmittal and use of Personal and Financial Information that occurred.

150.158.    Defendant's duties to keep the nonpublic personal information, including Personal and Financial Information, confidential also arose under the GLBA, which imposes "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

151.159.    Defendant's duties to keep the nonpublic personal information, including Personal and Financial Information, confidential also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including the unfair practice of failing to keep the nonpublic personal information confidential.

152.160.    Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiffs' and Class Members' Personal and Financial Information by disclosing and providing access to this information to Third Parties for the financial benefit of Third Parties (and fourth parties) and Defendant.

153.161.    Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Personal and Financial Information to benefit Third Parties (and fourth parties) and Defendant. Defendant actively sought and obtained Plaintiffs' and Class Members' Personal and Financial

Information. And Defendant knew or should have known that by integrating tracking technology on its Website that Plaintiffs' and Class Members' nonpublic personal information, including Personal and Financial Information, would be disclosed to the Third Parties (and used by the fourth parties).

154.162.    Personal and Financial Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiffs and Class Members by disclosing their Personal and Financial Information to Third Parties. This disclosure was of benefit to the Third Parties (and fourth parties) and Defendant by way of data harvesting, advertising, and increased sales.

155.163.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in the handling and securing of Personal and Financial Information of Plaintiffs and Class Members. This failure actually and proximately caused Plaintiffs' and Class Members' injuries.

156.164.    As a direct, proximate, and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or imminently will suffer injury and damages, including monetary damages, inappropriate advertisements and use of their Personal and Financial Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

157.165.    Defendant's negligence and breach of its common-law duties to exercise reasonable care directly and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of their Personal and Financial Information by Third Parties (and fourth parties); improper disclosure of their Personal and Financial Information; receipt of targeted advertisements reflecting private financial

information; lost benefit of their bargain; lost value of their Personal and Financial Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress; lost time and money incurred to mitigate and remediate the effects of use of their information, as to targeted advertisements that resulted from and were caused by Defendant's negligence; value to Plaintiffs and the Class Members of surrendering their choices to keep their Personal and Financial Information private and allowing Defendant to track their data; increased risk of future harm resulting from future use and disclosure of Plaintiffs' and the Class Members' Personal and Financial Information; and other injuries and damages as set forth herein. These injuries are ongoing, imminent, immediate, and continuing.

158.166.    Defendant's negligence directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class Members' Personal and Financial Information, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

159.167.    Plaintiffs and Class Members seek to recover the value of the unauthorized access to their Personal and Financial Information resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiffs may generally recover the reasonable use value of the intellectual property—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's

use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such intellectual property to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiffs and Class Members have a protectible property interest in their Personal and Financial Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions

160.168.        Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

161.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

162.    Plaintiffs being this negligence *per se* count in the alternative to their common law negligence claim.

163.    Pursuant to the laws set forth herein, including the FTC Act, the GLBA, and state law, Defendant was required by law and industry standards to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiffs' and Class Members' Personal and Financial Information.

164.    Plaintiffs and Class Members are within the class of persons that these statutes and rules were designed to protect.

165.    Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Personal and Financial Information.

166.    Defendant owed a duty to timely and adequately inform Plaintiffs and Class Members, in the event of their Personal and Financial Information being improperly disclosed to unauthorized Third Parties.

167.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Personal and Financial Information in compliance with applicable laws would result in unauthorized Third Parties gaining access to Plaintiffs' and Class Members' Personal and Financial Information, and resulting in Defendant's liability under principles of negligence *per se*.

168.    Defendant violated its duty under Section 5 of the FTC Act, the GLBA, and/or state law by failing to use reasonable measures to protect Plaintiffs' and Class Members' Personal and Financial Information and not complying with applicable industry standards as described in detail herein.

169.    Plaintiffs' and Class Member's Personal and Financial Information constitutes personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiffs and Class Members.

170.    As a proximate result of Defendant's negligence *per se* and breach of duties as set forth above, Plaintiffs and Class Members were caused to, *inter alia*, have their data shared with Third Parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific financial services, fear, anxiety and worry about the status of their Personal and Financial Information, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their Personal and Financial Information, all of

1    which can constitute actionable actual damages.

2        171.    Defendant's conduct in violation of applicable laws directly and proximately

3    caused the unauthorized access and disclosure of Plaintiffs' and Class Members' Personal and

4    Financial Information, and as a result, Plaintiffs and Class Members have suffered and will

5    continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek

6    actual, and compensatory damages, and all other relief they may be entitled to as a proximate result

7    of Defendant's negligence *per se.*

8

9        172.    Plaintiffs and Class Members are also entitled to punitive damages resulting from

10   the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs

11   and Class Members in conscious disregard of their rights. Such damages are needed to deter

12   Defendant from engaging in such conduct in the future.

13

14                                        **COUNT III**
15                **VIOLATION OF THE COMPREHENSIVE COMPUTER DATA ACCESS**
                      **AND FRAUD ACT, CAL. PENAL CODE § 502**
16                  **(On Behalf of Plaintiffs and the California Subclass)**

17       173.169.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth

18   herein.

19

20       174.170.    The California Legislature enacted the Comprehensive Computer Data

21   Access and Fraud Act, Cal. Penal Code § 502 to "expand the degree of protection afforded to

22   individuals, businesses, and governmental agencies from tampering, interference, damage, and

23   unauthorized access to lawfully created computer data and computer systems," and finding and

24   declaring "that the proliferation of computer technology has resulted in a concomitant proliferation

25   of computer crime and other forms of unauthorized access to computers, computer systems, and

26   computer data." Cal. Penal Code § 502(a).

27

28       175.171.    In enacting the CDAFA, the Legislature further found and declared "that

                                              48

protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

176.172.    Plaintiffs' and the Class Members' devices on which they accessed Defendant's Online Platforms and Websites, including their computers, smart phones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. Cal. Penal Code § 502(b)(5).

177.173.    By conduct complained of in the preceding paragraphs, Defendant violated Section 502(c)(1)(B) of CDAFA by knowingly accessing without permission Plaintiffs' and Class Members' devices in order to wrongfully obtain and use their personal data, including their Personal and Financial Information, in violation of Plaintiffs' and Class Members' reasonable expectations of privacy in their devices and data.

178.174.    Defendant violated Cal. Penal Code § 502(c)(2) by knowingly and without permission accessing, taking, copying, and using Plaintiffs' and the Class Members' Personal and Financial Information.

179.175.    Defendant used Plaintiffs' and Class Members' data as part of a scheme to defraud them and wrongfully obtain their data and other economic benefits. Specifically, Defendant intentionally concealed from Plaintiffs and Class Members that Defendant had secretly installed tracking pixels on its Online Platforms that surreptitiously shared Personal and Financial Information with third party advertising companies like Facebook. Had Plaintiffs and Class Members been aware of this practice, they would not have used Defendant's Website and Online Platforms.

180.176.    The computers and mobile devices that Plaintiffs and Class Members used when accessing Defendant's Website all have and operate "computer services" within the meaning of CDAFA. Defendant violated § 502(c) of the CDAFA by knowingly and without permission accessing and using those devices and computer services, and/or causing them to be accessed and used, *inter alia*, in connection with the Third Parties' (and fourth parties') wrongful use of such data.

181.177.    Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information."

182.178.    Defendant violated § 502(c)(8) by knowingly and without permission introducing a computer contaminant via trackers embedded into the Online Platforms which intercepted Plaintiffs' and the Class Members' private and sensitive financial information.

183.179.    Defendant's violation of the CDAFA caused Plaintiffs and Class Members, at minimum, the following damages:

a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b.    Defendant eroded the essential confidential nature of their relationship;

c.    Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d.    Plaintiffs and Class Members did not get the full value of the financial services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information.

~~184.~~180.    Plaintiffs and the Class Members seek compensatory damages in accordance with Cal. Penal Code § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable relief; as well as punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) as Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294; and reasonable attorney's fees under § 502(e)(2).

~~185.~~181.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

### ~~COUNT IV~~COUNT III
### VIOLATION OF CALIFORNIA'S CONSUMER PROTECTION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *et seq.*
### (On Behalf of Plaintiffs and the California subclass)

~~186.~~182.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

~~187.~~183.    Plaintiffs and Defendant are each a "person" under Cal. Bus. & Prof. Code § 17201.

~~188.~~184.    The California Business and Professions Code §§ 17201, *et seq*. prohibits acts of unfair competition, which includes unlawful business practices.

~~189.~~185.    Defendant's business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. seq*. (the "UCL") because, as alleged above, Defendant violated California common law, and other statutes and causes of action alleged herein.

~~190.~~186.    Defendant engaged in unlawful acts and practices by imbedding the Pixel on its Websites, which tracks, records, and transmits Plaintiffs' and Class Members' Personal and

Financial Information they disclose to Defendant in confidence its Website to Third Parties without Plaintiffs' and Class Members' knowledge and/or consent, in violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*.; the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; and by representing that their services have characteristics, uses, or benefits that they do not have in violation of Civil Code § 1770.

191.187.    When using Defendant's Website and services, Plaintiffs and Class Members relied on Defendant's status as a trusted financial institution.

192.188.    Inconsistent with its role as a financial service provider, Defendant disclosed Plaintiffs' and Class Members' Personal and Financial Information to Third Parties without their consent and for marketing purposes. Thus, Defendant represented that its services have characteristics, uses, or benefits that they do not have and represented that its services are of a particular standard, quality, or grade when they were not, in violation of Cal. Civil Code § 1770.

193.189.    Plaintiffs and Class Members were reasonable to assume, and did assume, that Defendant would take appropriate measures to keep their Personal and Financial Information secure and not share it with Third Parties or allow Third Parties (and fourth parties) to use it without their express consent.  Defendant also had a duty to disclose that it was sharing their Customers' Personal and Financial Information with Third Parties. However, Defendant did not disclose at any time that it was sharing this Personal and Financial Information with Third Parties via tracking technologies or that Third Parties (and fourth parties) were using their Personal and Financial Information.

194.190.    Had Plaintiffs and Class Members known that Defendant would intercept, collect, and transmit their Personal and Financial Information to Third Parties, Plaintiffs and the Class Members would not have used Defendant's services.

195.191.    Plaintiffs and Class Members have a property interest in their Personal and Financial Information. By surreptitiously collecting and otherwise misusing Plaintiffs' and Class Members' Personal and Financial Information, Defendant has taken property from Plaintiffs and Class Members without providing just (or indeed any) compensation.

196.192.    By deceptively collecting, using, and sharing Plaintiffs' and Class Members' Personal and Financial Information with Third Parties for Third Party (and fourth parties) use, Defendant has taken money or property from Plaintiffs and Class Members. Accordingly, Plaintiffs seek restitution on behalf of themselves and the Class.

197.193.    Defendant's business acts and practices also meet the unfairness prong of the UCL according to all three theories of unfairness.

198.194.    First, Defendant's business acts and practices are "unfair" under the UCL pursuant to the three-part test articulated in *Camacho v. Automobile Club of Southern California* (2006) 142 Cal. App. 4th 1394, 1403: (a) Plaintiffs and Class Members suffered substantial injury due to Defendant's Disclosure of their Personal and Financial Information; (b) Defendant's disclosure of Plaintiffs' and Class Members' Personal and Financial Information provides no benefit to Customers, let alone any countervailing benefit that could justify Defendant's Disclosure of Personal and Financial Information without consent for marketing purposes or other pecuniary gain; and (c) Plaintiffs and Class Members could not have readily avoided this injury because they had no way of knowing that Defendant was implementing tracking technology.

199.195.    Second, Defendant's business acts and practices are "unfair" under the UCL because they are "immoral, unethical, oppressive, unscrupulous, or substantially injurious" to Plaintiffs and Class Members, and "the utility of [Defendant's] conduct," if any, does not "outweigh the gravity of the harm" to Plaintiffs and Class Members. *Drum v. San Fernando Valley*

*Bar Ass'n,* (2010) 182 Cal. App. 4th 247, 257. Defendant secretly collected, disclosed, and otherwise misused Plaintiffs' and Class Members' Personal and Financial Information by bartering it to Third Parties in return for marketing and profit. This surreptitious, willful, and undisclosed conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious. Moreover, no benefit inheres in this conduct, the gravity of which is significant.

200.196.    Third, Defendant's business acts and practices are "unfair" under the UCL because they run afoul of "specific constitutional, statutory, or regulatory provisions." *Drum*, 182 Cal. App. 4th at 256 (internal quotation marks and citations omitted). California has a strong public policy of protecting consumers' privacy interests, including consumers' personal data, as codified in California's Constitution in Article I, section 1; the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*; and the CDAFA, Cal. Penal Code § 502, among other statutes.

201.197.    Defendant violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise exploiting Plaintiffs' and Class Members' Personal and Financial Information by sharing that information with Third Parties via tracking technologies without Plaintiffs' and/or Class Members' consent.

202.198.    Had Plaintiffs and Class Members known Defendant would intercept, collect, and transmit their Personal and Financial Information to Facebook and other Third Parties, Plaintiffs and Class Members would not have used Defendant's services.

203.199.    Plaintiffs and Class Members were reasonable to assume, and did assume, that Defendant would take appropriate measures to keep their Personal and Financial Information secure and not share it with Third Parties without their express consent. Defendant was in sole possession of and had a duty to disclose the material information that Plaintiffs' and Class Members' Personal and Financial Information would be shared with Third Parties via trackers.

Defendant did not disclose at any time that they were sharing this Personal and Financial Information with Third Parties via trackers.

204.200.    Plaintiffs and Class Members have a property interest in their Personal and Financial Information. By surreptitiously collecting and otherwise misusing Plaintiffs' and Class Members' Personal and Financial Information, Defendant has taken property from Plaintiffs and Class Members without providing just (or indeed any) compensation.

205.201.    Plaintiffs and Class Members have lost money and property due to Defendant's conduct in violation of the UCL. Personal and Financial Information such as that which Defendant collected and transmitted to Third Parties has objective monetary value. Companies are willing to pay for Personal and Financial Information, like the information Defendant unlawfully collected and transmitted to Third Parties. For example, in 2015 Pfizer annually payspaid approximately $12 million to purchase similarly sensitive information on health data, from various sources.[44] Data shows that email addresses alone are worth around $89 apiece to companies.  And estimates show "the annual value of your data if you live in the US is at least $700" per user.

206.202.    By deceptively collecting, using, and sharing Plaintiffs' and Class Members' Personal and Financial Information with Third Parties, and by allowing Third Parties (and fourth parties) to use their Personal and Financial Information, Defendant has taken money and/or property from Plaintiffs and Class Members. Accordingly, Plaintiffs seek restitution on behalf of themselves and the Class.

207.203.    As a direct and proximate result of Defendant's unfair and unlawful

---

[44]    Adam Tanner, *How Data Brokers Make Money Off Your Medical Records*, SciAm (Feb. 1, 2016)  https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/.

methods and practices of competition, Plaintiffs and Class Members suffered actual damages, including, but not limited to, the loss of the value of their Personal and Financial Information.

208.204.    As a direct and proximate result of its unfair and unlawful business practices, Defendant has each been unjustly enriched and should be required to make restitution to Plaintiffs and Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant because of its unlawful and unfair business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

## COUNT V COUNT IV
**VIOLATION OF CALIFORNIA CONSUMER PRIVACY ACT,**
**Cal. Civ. Code § 1798.100, *et seq.***
**(On Behalf of Plaintiffs and the California subclass)**

209.205.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

210.206.    The CCPA grants consumers rights, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they exercise privacy rights. Cal. Civ. Code § 1798.100, *et seq*.

211.207.    The CCPA dictates specifically that "[a] third party shall not sell or share personal information about a consumer that has been sold to, or shared with, the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civ. Code § 1798.115 (emphasis added).

212.208.    Defendant collected Plaintiffs' and Class Members Personal and Financial Information, including their personal information, with the purpose of providing financial services

56

in the course of and as part of its business in California.

213.209.        Disclosing Plaintiffs' and Class Members' Personal and Financial Information to Third Parties was not reasonably necessary or proportionate to perform the reasonably expected financial services that they applied for or received.

214.210.        By collecting, using, and selling Plaintiffs' and Class Members' personal information and location data to Third Parties for Third Party (and fourth party) use, all without providing consumers with notice, Defendant violated the CCPA.

215.211.        By failing to inform Customers like Plaintiffs and Class Members of the personal information collected about them and the Third Parties with whom that personal information was shared, and the Third Parties' (and fourth parties') use of that personal information, Defendant violated the CCPA.

216.212.        By failing to abide by Customers' requests to delete collected personal information, Defendant violated the CCPA.

217.213.        Pursuant to Cal. Civ. Code § 1798.150(b), Plaintiffs will sendsent Defendant notice of their CCPA claims shortly after the date of this filing. If Defendant does not correct its business practices,the original complaint was filed. To date, Defendant has failed to cure the CCPA violation. Plaintiffs will amend (or seek leave to amend) the complaint to addseek claims for monetary relief, including statutory and actual damages under the CCPA. To date, Defendant has failed to cure the CCPA violation.

218.214.        As a result of Defendant's reckless violations, Plaintiffs are entitled to actual damages, statutory damages, and attorneys' fees and costs. Cal. Civ. Code § 1798.150.

**COUNT VICOUNT V**
**BREACH OF EXPRESS AND IMPLIED CONTRACT**
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

57
AMENDED CLASS ACTION COMPLAINT

219.215.     Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

220.216.     Plaintiffs and Class Members also entered into an express and implied contract with UWM when they obtained financial services from UWM, or otherwise provided nonpublic personal information, including Personal and Financial Information, to UWM.

221.217.     As part of these transactions, UWM explicitly and implicitly agreed to safeguard and protect Plaintiffs' and Class Members' Personal and Financial Information.

222.218.     Plaintiffs and Class Members entered into express and implied contracts with the reasonable expectation (based on UWM's own express and implied promises) that UWM would keep their nonpublic personal information, including Personal and Financial Information, confidential. Plaintiffs and Class Members believed that UWM would use part of the monies paid to UWM under the express and implied contracts to keep their nonpublic personal information, including Personal and Financial Information, confidential.

223.219.     Plaintiffs and Class Members would not have provided and entrusted their nonpublic personal information, including Personal and Financial Information, or would have paid less for UWM's services in the absence of the express and implied contract or implied terms between them and UWM. The safeguarding of the nonpublic personal information, including Personal and Financial Information, of Plaintiffs and class members was critical to realize the intent of the parties.

224.220.     As extensively detailed above, UWM breached its express and implied contracts with Plaintiffs and class members to protect their nonpublic personal information, including Personal and Financial Information, when it disclosed that information to Third Parties.

225.221.     As a direct and proximate result of UWM's breach of express and implied

contract, Plaintiffs and Class Members sustained actual losses and damages as described in detail above.

<del>COUNT VII</del>COUNT VI

**UNJUST ENRICHMENT (AS ALTERNATIVE TO CONTRACT CLAIMS)**
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

<del>226.</del>222.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

<del>227.</del>223.    Plaintiffs and Class Members have an interest, both equitable and legal and financial, in their Personal and Financial Information, that was conferred upon, collected by, and maintained by Defendant and that was ultimately disclosed without their consent.

<del>228.</del>224.    Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of valuable, sensitive, personal, and financial information—Personal and Financial Information—that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, for marketing purposes, and for sale or trade with Third Parties. Defendant did not share this benefit with Plaintiffs and Class Members.

<del>229.</del>225.    Plaintiffs and Class Members would not have used Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their Personal and Financial Information to Third Parties or allow Third Parties (and fourth parties) to use their Personal and Financial Information.

<del>230.</del>226.    Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

<del>231.</del>227.    The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members themselves. Under unjust enrichment principles, it

59
<span style="color:red">AMENDED </span>CLASS ACTION COMPLAINT

would be inequitable for Defendant to retain the profit and/or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

232.228.    Defendant continues to benefit and profit from its retention and use of Plaintiffs' and Class Members' Personal and Financial Information, while its value to Plaintiffs and Class Members has been diminished.

233.229.    Plaintiffs plead this claim separately as well as in the alternative to claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiffs' claims for damages or enters judgment on them in favor of the Defendant, Plaintiffs' will have no adequate legal remedy. Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in her other causes of action, in the event that such causes of action do not succeed. Plaintiffs and the Class Members may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action, and, if so, will lack an adequate remedy at law.

234.230.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of the conduct and the unauthorized Disclosure alleged herein

COUNT VIIICOUNT VII
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

235.231.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

236.232.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here,

that are tortious and violate the terms of the federal and state statutes described in this complaint.

237.233.        An actual controversy has arisen regarding UWM's present and prospective common law and other duties to keep its Customers' Personal and Financial Information confidential and whether Defendant is currently keeping that information confidential. Customers like ~~Plaintiffs~~Plaintiff Caloca who remain UWM Customers who need to use UWM's Website to manage their accounts and mortgages with UWM. Plaintiffs and similar Class Members thus remain at imminent risk that additional disclosure of their Personal and Financial Information will occur in the future.

238.234.        Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendant continues to owe a legal duty to secure Customers' Personal and Financial Information, under the common law, Section 5 of the FTC Act, the GLBA, and various state statutes;

b.    Defendant continues to breach this legal duty by disclosing its Customers' Personal and Financial Information to unaffiliated Third Parties.

239.235.        The Court also should issue corresponding prospective injunctive relief requiring Defendant to keep its nonpublic personal information, including Personal and Financial Information, confidential consistent with law and industry standards.

240.236.        If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy. The risk of additional disclosure is real, immediate, and substantial as trackers remain operative on Defendant's website to this day. If additional disclosure occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to

61

AMENDED CLASS ACTION COMPLAINT

bring multiple lawsuits to rectify the same conduct.

241.237.     The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if UWM continues to disclose its Customers' Personal and Financial Information, Plaintiffs and Class Members will likely be subjected to the harms described herein. On the other hand, the cost to Defendant of complying with an injunction by keeping its Customers' Personal and Financial Information, confidential is relatively minimal (for example, removing trackers from its website), and Defendant has a pre-existing legal obligation to do so.

242.238.     Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing UWM's additional unlawful disclosures of Customers' Personal and Financial Information, thus eliminating the additional injuries that would result to Plaintiffs and the hundreds of thousands of Customers whose information has been and will continue to be disclosed.

### COUNT IXCOUNT VIII
### BREACH OF CONFIDENCE
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

243.239.     Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

244.240.     At all times during Plaintiffs' and Class Members' interactions with UWM, UWM was fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' Personal and Financial Information.

245.241.     As alleged herein and above, UWM's relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' Personal and Financial Information, would be collected, stored, and protected in confidence, and would not

be disclosed to Third Parties, or used by Third Parties (and fourth parties) without notice and consent.

246.242.    Plaintiffs and Class Members provided UWM with their Personal and Financial Information, with the explicit and implicit understandings that UWM would protect and not permit that information to be disseminated to and used by unaffiliated Third Parties (and fourth parties) without notice, consent, and sufficient opportunity to opt out.

247.243.    UWM voluntarily received in confidence Plaintiffs' and Class Members' Personal and Financial Information, with the understanding and affirmative representation to Customers that the information would not be disclosed or disseminated to unaffiliated Third Parties for Third Parties' (and fourth parties') marketing purposes.

248.244.    UWM disclosed Plaintiffs' and Class Members' Personal and Financial Information, without notice, without express permission, and without opportunity to opt out.

249.245.    But for UWM's Disclosure of Plaintiffs' and Class Members' Personal and Financial Information, in violation of the parties' understanding of confidence, their Personal and Financial Information would not have been disclosed to Third Parties, or used for Third Party (and fourth party) marketing and profit, without their consent.

250.246.    The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of UWM's nonconsensual disclosure of Plaintiffs' and Class Members' Personal and Financial Information. UWM knew it was disclosing Plaintiffs' and Class Members' Personal and Financial Information to Third Parties, for Third Party (and fourth party) use, without their consent.

251.247.    As a direct and proximate result of UWM's breaches of confidence, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be

proven at trial.

~~252.~~248.    Plaintiffs seek all monetary and non-monetary relief allowed by law.

~~COUNT X~~COUNT IX

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT,**
**CAL. PENAL CODE §§ ~~630~~631,** *et seq.*
**(On Behalf of Plaintiffs and the California subclass)**

~~253.~~249.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

~~254.~~250.    The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. declaring that:

> advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

> The Legislature by this chapter intends to protect the right of privacy of the people of this state.

Cal. Penal Code § 630.

251.    ~~Cal. Penal Code § 631(a) prohibits persons from "aid[ing], agree[ing] with, employ[ing], or conspir[ing] with" a third party to "read[], or attempt[] to read, or to~~To establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over

64

any wire, line, or cable, or is being sent from, or received at any place within this state, or who uses,

*Or*

255.    Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained" "by means of any machine, instrument, or contrivance, or in any other manner…" Cal. Penal Code § 631(a)., Cal. Penal Code § 632(a) prohibits

*Or*

Aids, agrees with, employs, or conspires with any person or persons fromto unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

252.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

256.253.    Defendant's website and the tracking technologies Defendant intentionally recording confidential communications without consent of all parties to the communicationinstalled on it are prohibited, as they constitute a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

257.254.    All alleged communications between individual PlaintiffsPlaintiff or Class Members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets)

that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

255.    CCPA and CIPA are complementary statutes. CCPA states that "law relating to consumers' personal information should be construed to harmonize with the provisions of this title." Cal. Civ. Code § 1798.175. CCPA further explicitly states that "in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." *Id.* The 'opt-out requirements' under the CCPA apply in this online context.

~~258.~~256.    As alleged in the preceding paragraphs, by use of tracking technology, Defendant used a recording device to record the confidential communications in transit including ~~Personal and Financial~~communications or Disclosed Information without the consent of ~~Plaintiffs~~Plaintiff or Class Members and then transmitted such information to Third Parties for Third Party (and fourth party) use.

~~259.~~257.    At all relevant times, Defendant's aiding of Third Parties to learn the contents of communications and Defendant's recording of confidential communications was without ~~Plaintiffs'~~Plaintiff's and the Class Members' authorization and consent.

~~260.~~258.    ~~Plaintiffs~~Plaintiff and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendant. Defendant had duties under statutory and common law to safeguard ~~its Customers' Personal and Financial~~visitors communications and/or Disclosed Information, and not disclose it without authorization. Defendant never received any authorization and disclosed ~~Plaintiffs'~~Plaintiff's and the Class's ~~Personal and Financial~~communications or Disclosed Information regardless.

259.    Defendant engaged in and continued to engage in interception by aiding others

(including ~~Facebook~~The Trade Desk and Google) to secretly record the contents of ~~Plaintiffs'~~Plaintiff's and Class Members' wire communications.

~~261.~~260.        .

~~262.~~261.        The intercepting devices used in this case include, but are not limited to:

a. Those to which Plaintiffs' and Class Members' communications were disclosed;

b. Plaintiffs' and Class Members' personal computing devices;

c. Plaintiffs' and Class Members' web browsers;

d. Plaintiffs' and Class Members' browser-managed files;

e. Trackers like the Meta Pixel;

f. Internet cookies;

g. Other pixels, trackers, and/or tracking technology installed on Defendant's Website and/or server;

h. Defendant's computer servers;

i. Third Party source code utilized by Defendant; and

j. Third Party computer servers (including Facebook).

~~263.~~262.        Defendant aided in the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to and recorded by the Third Parties include information which identifies the parties to each communication, their existence, and their contents.

~~264.~~263.        Plaintiffs and Class Members reasonably expected that their Personal and Financial Information was not being intercepted, recorded, and disclosed to Third Parties or used by Third Parties (and fourth parties) for marketing and profit.

~~265.~~264.        No legitimate purpose was served by Defendant's willful and intentional

disclosure of Plaintiffs' and Class Members' Personal and Financial Information to Third Parties. Neither Plaintiffs nor Class Members consented to the disclosure of their Personal and Financial Information by Defendant to Third Parties or the use of the Personal and Financial Information by Third Parties (and fourth parties).

266.265.    The trackers that Defendant utilized are designed such that they transmitted each of a website user's actions to Third Parties alongside and contemporaneously with the user initiating the communication. Thus, Plaintiffs' and Class Members' communications were intercepted in transit to the intended recipient (Defendant) before they reached Defendant's servers.

267.266.    Defendant willingly facilitated the Third Parties' interception and collection of Plaintiffs' and Class Members' Personal and Financial Information, and the Third Parties' (and fourth parties') use of their Personal and Financial Information, by embedding trackers on its Website.  Moreover, Defendant had full control over these trackers, including which webpages contained the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

268.267.    Defendant gave substantial assistance to Third Parties in violating the privacy rights of UWM's Customers, even though Defendant's conduct constituted a breach of the confidentiality duties that it owed, including the duty financial institutions owe to their customers and customers' property. Defendant knew that the installation of trackers on its website would result in the unauthorized disclosure of its Customers' communications to Third Parties, and Third Party (and fourth party) use of those communications, yet nevertheless did so anyway.

269.268.    Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of

monetizing their Personal and Financial Information, including using their Personal and Financial Information to develop marketing and advertising strategies.

270.269.    The Personal and Financial Information that Defendant assisted Third Parties with reading, learning, and exploiting, included Plaintiffs' and Class Members' Personal and Financial Information customers input into and accessed on UWM's Website. UWM disclosed details about Customers, like Plaintiffs and Class Personal and Financial Information and their interactions with UWM's website as users applied for or managed their mortgages, including the fact that a user was on a certain page, that users clicked buttons and what URLs or webpages they led to, the Customer's refinancing options and the user's selections, the state in which the property was located, type of property, and the reason the customer was seeking to refinance.

271.270.    Plaintiffs and the Class Members seek statutory damages under Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

272.271.    In addition to statutory damages, Defendant's violations caused Plaintiffs and Class Members the following damages.

a.  Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private.

b.  Defendant eroded the essential confidential nature of the mortgagee-mortgagor relationship.

c.  Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d.  Plaintiffs and Class Members did not get the full value of the financial services for which they paid, which included Defendant's duty to maintain confidentiality; and

e.  Defendant's actions diminished the value of Plaintiffs' and Class Members' Personal and Financial Information.

273.272.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT XICOUNT X**

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT,**
**CAL. PENAL CODE §§ 632, *et seq.***
**(On Behalf of Plaintiff and the California subclass)**

273.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

274.    CIPA § 632(a) prohibits an entity from intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

275.    As alleged in the preceding paragraphs, by use of tracking technology, Defendant used a recording device to record the confidential communications including Disclosed Information without the consent of Plaintiff or Class Members and then transmitted such information to Third Parties for Third Party (and fourth party) use.

276.    At all relevant times, Defendant's aiding of Third Parties to learn the contents of communications and Defendant's recording of confidential communications was without Plaintiff's and the Class Members' authorization and consent.

277.    Plaintiff and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendant. Defendant had duties under statutory and

70

common law to safeguard visitors' communications and Disclosed Information, and not disclose it without authorization. Defendant never received any authorization and disclosed Plaintiff's and the Class's communications and Disclosed Information regardless.

278. Defendant engaged in and continued to engage in interception by aiding others (including The Trade Desk and Google) to secretly record Plaintiff's and Class Members' wire communications.

279. The intercepting devices used in this case include, but are not limited to:

k. Those to which Plaintiff's and Class Members' communications were disclosed;

l. Plaintiff's and Class Members' personal computing devices;

m. Plaintiff's and Class Members' web browsers;

n. Plaintiff's and Class Members' browser-managed files;

o. Trackers like the Meta Pixel;

p. Internet cookies;

q. Other pixels, trackers, and/or tracking technology installed on Defendant's Website and/or server;

r. Defendant's computer servers;

s. Third Party source code utilized by Defendant; and

t. Third Party computer servers (including Facebook).

280. Defendant aided in the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendant that were redirected to and recorded by the Third Parties include information which identifies the parties to each communication, their existence, and their contents.

281. Plaintiff and Class Members reasonably expected that their Personal and Financial

Information was not being intercepted, recorded, and disclosed to Third Parties or used by Third Parties (and fourth parties) for marketing and profit.

282.     No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Personal and Financial Information to Third Parties. Neither Plaintiff nor Class Members consented to the disclosure of their Personal and Financial Information by Defendant to Third Parties or the use of the Personal and Financial Information by Third Parties (and fourth parties).

283.     The trackers that Defendant utilized are designed such that they transmitted each of a website user's actions to Third Parties alongside and contemporaneously with the user initiating the communication. Thus, Plaintiff's and Class Members' communications were intercepted in transit to the intended recipient (Defendant) before they reached Defendant's servers.

284.     Defendant willingly facilitated the Third Parties' interception and collection of Plaintiff's and Class Members' Personal and Financial Information, and the Third Parties' (and fourth parties') use of their Personal and Financial Information, by embedding trackers on its Website.  Moreover, Defendant had full control over these trackers, including which webpages contained the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

285.     Defendant gave substantial assistance to Third Parties in violating the privacy rights of Mr. Cooper's Customers, even though Defendant's conduct constituted a breach of the confidentiality duties that it owed, including the duty financial institutions owe to their customers and customers' property. Defendant knew that the installation of trackers on its website would result in the unauthorized disclosure of its Customers' communications to Third Parties, and Third Party (and fourth party) use of those communications, yet nevertheless did so anyway.

AMENDED CLASS ACTION COMPLAINT

286.    Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal and Financial Information, including using their Personal and Financial Information to develop marketing and advertising strategies.

287.    The Personal and Financial Information that Defendant assisted Third Parties with reading, learning, and exploiting, included Plaintiff's and Class Members' Personal and Financial Information customers input into and accessed on Mr. Cooper's Website. Mr. Cooper disclosed details about Customers, like Plaintiff and Class Personal and Financial Information and their interactions with Mr. Cooper's website as users applied for or managed their mortgages, including the fact that a user was on a certain page, that users clicked buttons and what URLs or webpages they led to, the Customer's refinancing options and the user's selections, the state in which the property was located, type of property, and the reason the customer was seeking to refinance.

288.    Plaintiff and the Class Members seek statutory damages under Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

289.    In addition to statutory damages, Defendant's violations caused Plaintiff and Class Members the following damages.

   a.   Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private.

   b.   Defendant eroded the essential confidential nature of the mortgagee-mortgagor relationship.

   c.   Defendant took something of value from Plaintiff and Class Members and derived benefit

therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d.  Plaintiff and Class Members did not get the full value of the financial services for which they paid, which included Defendant's duty to maintain confidentiality; and

e.  Defendant's actions diminished the value of Plaintiff's and Class Members' Personal and Financial Information.

290.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT XI**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT,**
**CAL. PENAL CODE §§ 638.51, *et seq.***
**(On Behalf of Plaintiff and the California subclass)**

291.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

292.    CIPA § 638.51 prohibits the installation or use of "a pen register or trap and trace device without first obtaining a court order." Cal. Penal Code § 638.51(a).

293.    Defendant repeatedly violated CIPA § 638.51(a) by installing and using the Trackers without a court order and without any valid consent from users. No valid consent was obtained. Instead, Defendant relied on a knowingly deceptive interface that falsely conveyed user control while continuing to intercept and transmit private communications.

294.    An "electronic communication" is defined as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system[.]" Cal. Penal Code § 629.51(a)(2).

295.    All communications between individual Plaintiff or Class Members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive

communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

296.    California Penal Code § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

297.    The Trackers are "pen registers" under § 638.50(b) of CIPA because they record "routing, addressing, or signaling information" transmitted by the devices of visitors to Defendant's website. Cal. Penal Code § 638.50(b).

298.    California Penal Code § 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

299.    The Trackers are also "trap and trace devices" under CIPA § 638.50(c) because they "capture the incoming electronic or other impulses that identify . . . dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication[.]" Cal. Penal Code § 638.50(c).

300.    During the Class Period, Defendant installed the Trackers on its website and used them to capture and transmit addressing information, including Plaintiff's and Class Members' IP addresses and other unique identifiers to Third Parties.

301.    Plaintiff and Class Members did not provide their consent prior to Defendant's installation and use of the Trackers. On information and belief, Defendant also did not obtain a court order to install or use the Trackers.

AMENDED CLASS ACTION COMPLAINT

302.    Under California Penal Code § 637.2, Plaintiff and Class members have been injured by Defendant's violations of California Penal Code § 638.51(a), and each seek statutory damages of $5,000 per violation.

303.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT XII**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. §§ 2511(1), *et seq.***
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

274.304.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

275.305.    The ECPA protects both sending and receipt of communications. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

276.306.    The transmissions of Plaintiffs' and Class Members' Personal and Financial Information to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

277.307.    **Electronic Communications**. The transmission of Personal and Financial Information between Plaintiffs and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

278.308.    **Content**. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of

76

that communication." *See* 18 U.S.C. § 2510(8).

279.309.        **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(4), (8).

280.310.        **Electronic, Mechanical or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Defendant's web-servers;

d. Defendant's Website; and

e. The tracking technology deployed by Defendant effectuated the sending and acquisition of customer communications.

281.311.        By utilizing and embedding the tracking technology on its Website, Defendant intentionally intercepted, endeavored to intercept and procured another person to intercept the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

282.312.        Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the tracking technology which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Personal and Financial Information to Third Parties.

283.313.        Defendant's intercepted communications include, but are not limited to,

77

communications to/from Plaintiffs and Class Members regarding Personal and Financial Information.

284.314.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to Third Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

285.315.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

286.316.    **Unauthorized Purpose.** Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

287.317.    Defendant intentionally used the wire or electronic communications to increase its profit margins and save on marketing costs.

288.318.    Defendant specifically used tracking technology to track and to utilize Plaintiffs' and Class Members' Personal and Financial Information for financial gain.

289.319.    Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

290.320.    Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy via the tracking technology.

291.321.    In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of its Website, Defendant's purpose was tortious, criminal and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation or matter that would be highly offensive to a reasonable person; and (ii) violation of GLBA, the FTC Act, invading Plaintiffs' and Class Members' privacy, and in breach of its fiduciary duty of confidentiality.

### COUNT XIICOUNT XIII
### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2511(3)(a)
### UNAUTHORIZED DIVULGENCE BY ELECTRONIC COMMUNICATIONS SERVICE
### (On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)

292.322.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

293.323.    The ECPA statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

294.324.    **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant's Website is an electronic communication service which provides to users thereof, customers of Defendant, the ability to send or receive electronic communications; in the absence of Defendant's Website, internet users could not send or receive communications regarding Plaintiffs' and Class Members' Personal and Financial Information.

295.325.    **Intentional Divulgence**. Defendant intentionally designed the tracking technology and was or should have been aware that, if so configured, it could divulge Plaintiffs' and Class Members' Personal and Financial Information. Upon information and belief, Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications was contemporaneous with their exchange with Defendant's Website, to which they directed their communications.

296.326.    Defendant divulged the contents of Plaintiffs' and Class Members' electronic communications without authorization and/or consent.

297.327.    **Exceptions do not apply**. In addition to the exception for communications directly to an electronic communications service ("ECS")[45] or an agent of an ECS, the ECPA states that

> [a] person or entity providing electronic communication service to the public may divulge the contents of any such communication"…"as otherwise authorized in section 2511(2)(a) or 2517 of this title; "with the lawful consent of the originator or any addressee or intended recipient of such communication;" c. "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or d. "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency.

U.S.C. § 2511(3)(b).

298.328.    Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for

---

[45] An ECS is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

80

mechanical or service quality control checks.

299.329.    Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications to Facebook, Google, and Microsoft was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of Defendant's service nor (ii) necessary to the protection of the rights or property of Defendant.

300.330.    Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

301.331.    Defendant's divulgence of the contents of Plaintiffs' and the Class Members' communications on its Website through the tracking technology was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (i) Plaintiffs and Class Members did not authorize Defendant to divulge the contents of their communications and (ii) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiffs and Class Members were exchanging information.

302.332.    Moreover, Defendant divulged the contents of Plaintiffs' and Class Members' communications through tracking technology to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

303.333.    The contents of Plaintiffs' and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

304.334.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment as follows:

A.    For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B.    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

C.    For an award of punitive damages, as allowable by law;

D.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Personal and Financial Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

E.    For an Order declaring the rights and obligations of the parties, including, without limitation, that Defendant owes a legal duty to its Customers to secure their Personal and Financial Information and that Defendant violates this legal duty by disclosing its Customers' Personal and Financial Information to unaffiliated Third Parties;

F.    For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Personal and Financial Information compromised and unlawfully disclosed to Third Parties;

G.    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

AMENDED CLASS ACTION COMPLAINT

H.   For an Order compelling Defendant to pay for not less than three years of credit monitoring services for Plaintiffs and the Classes;

I.   For an award of reasonable attorneys' fees and costs under the laws outlined above, the common fund doctrine, and any other applicable law;

J.   Costs and any other expenses, including expert witness fees incurred by Plaintiffs in connection with this action;

K.   Pre- and post-judgment interest on any amounts awarded; and

L.   Such other and further relief as this court may deem just and proper.

**JURY DEMAND**

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a trial by jury on all issues so triable.

Dated: ~~May 14, 2024~~September 12, 2025          Respectfully submitted,

_____

Natalie Lyons, No. 293026
Vess A. Miller, No. 278020
Lynn A. Toops*
Lisa M. La Fornara*
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
nlyons@cohenmalad.com
vmiller@cohenmalad.com
ltoops@cohenmalad.com
llafornara@cohenmalad.com

J. Gerard Stranch, IV*
Emily E. Schiller*
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203

83
AMENDED CLASS ACTION COMPLAINT

(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
eschiller@stranchlaw.com

Samuel J. Strauss*
Raina C. Borrelli*
STRAUSS BORRELLI, PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
(872) 263-1100
(872) 263-1109 (facsimile)
sam@straussborrelli.com
raina@straussborrelli.com

*To seek admission *pro hac vice*

***Counsel for Plaintiffs and the Proposed Classes***

AMENDED CLASS ACTION COMPLAINT